David Karl Gross, ABA #9611065
Leila R. Kimbrell, ABA #0611110
Birch Horton Bittner & Cherot
1127 W. Seventh Avenue
Anchorage, AK 99501
Telephone: 907.276.1550
Facsimile: 907.276.3680

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| COPPER RIVER SEAFOODS, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> CHUBB CUSTOM INSURANCE ) <br> COMPANY, ) <br> ) <br> Defendant. ) <br> ) | Case No.: 3:16-cv-_____-\_\_\_ |

## **COMPLAINT**

COMES NOW Plaintiff, Copper River Seafoods, Inc. ("CRS"), by and through undersigned counsel of record, and for its claims for relief, states and alleges upon information and belief as follows:

### **I. PARTIES**

1. CRS is an Alaska corporation headquartered in Anchorage, Alaska, and doing business throughout the State of Alaska. CRS is qualified in all respects to bring this action.

2. Defendant Chubb Custom Insurance Company ("Chubb") is a corporation incorporated in the State of Delaware. Chubb was, at all material times,

COPPER RIVER SEAFOODS V. CHUBB INSURANCE　　　　CASE NO. 3:16-CV-_____-\_\_\_
COMPLAINT　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　PAGE 1 OF 19
F:\506636\65\00497463.DOCX

Case 3:16-cv-00039-TMB   Document 1   Filed 02/05/16   Page 1 of 19

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

selling insurance in Alaska to Alaska corporations and citizens, and did sell the insurance at issue in this lawsuit to CRS and its owners in Alaska.

## II. JURISDICTION AND VENUE

3. This Court has jurisdiction over the parties and the subject matter of this action pursuant to 28 U.S.C. § 1332, as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states; and pursuant to 28 U.S.C. §§ 2201 and 2202 as this is an action for declaratory relief.

4. In accordance with 28 U.S.C. §§ 1391(b)(1) and (2), venue in this district is appropriate as the insured loss event at issue occurred in Cordova, Alaska; Plaintiff has suffered injuries, attendant to the bad faith manner in which Chubb has conducted its loss investigation and adjustment in Alaska; the vast majority, if not all, of the events and activities giving rise to the claims in this complaint occurred in Alaska; and the vast majority of witnesses reside in or are found in Alaska.

## III. THE INSURANCE POLICY

5. This lawsuit is the result of Chubb refusing to honor the promises made when it sold insurance to CRS, the bad faith manner in which Chubb has chosen to conduct its loss investigation and adjustment, and Chubb's wrongful denial of coverage for the loss. It took Chubb over eight months to make a self-serving coverage decision adverse to CRS.

6. Chubb sold CRS property insurance under Policy Number 7957-35-05, providing insurance coverage for the period December 31, 2014 to December 31, 2015, with various limits of insurance implicated by various reported losses. The

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

insurance coverage included, without limitation, coverage for damages attending any structural failure, extra expenses incurred related to any insured loss, business interruption insurance and ensuing loss insurance. This insurance is referred to herein as the "Policy." The Loss Limit for the various insurance coverages implicated by the loss at issue is $15 million, per the terms of the Policy.

7. In pertinent part, and without limitation, the Policy provides CRS, among others, insurance coverage for property damage. The coverage provisions read:

> We will pay for direct physical loss or damage to **building** or **personal property** caused by or resulting from a peril not otherwise excluded….(Emphasis in original.)

There is an exclusion for "collapse," but the exception to the exclusion reads:

> This Collapse Exclusion does not apply to loss or damage caused by or resulting from **building collapse**. (Emphasis in original.)

The words "Building Collapse" is a defined term in the Policy. The definition, in pertinent part, reads:

> **Building collapse** means the actual abrupt falling down or caving in of all or any part of a structure caused by or resulting from:….[W]eight of people or **personal property**. (Emphasis in original.)

8. The Policy further provides, in pertinent part and without limitation, insurance coverage for loss of Business Income with Extra Expense. The coverage provisions read:

> We will pay for the actual: **Business income** loss you incur due to the actual suspension of your **operation;** or **Extra expense** you incur due to the actual or potential suspension of your **operations**... (Emphasis in original.)

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

9. There are no applicable exclusions to the coverage for business income or business interruption.

## IV. THE FACTS

10. On May 8, 2015, the day before the opening of CRS's most important fish processing and production season, CRS's two-story fish processing/storage/office building at One Cannery Row, Cordova, Alaska (hereinafter the "Building") was damaged and rendered unusable as a result of an insured peril. A portion of the foundation of the Building caved in as a result of the "weight of personal property" being placed in the second story of the Building adjacent to a bearing wall. CRS lost the use of a large portion of its processing facility at a critical time. CRS, through its insurance broker Marsh & McLennan Agency, promptly tendered the loss claim to Chubb.

11. On May 12, 2015, CRS confirmed receipt of the claim and advised that the claim would be assigned to a Chubb adjuster. Upon information and belief, Chubb hired Ron Huffman, an Anchorage based adjuster with Vericlaim, to conduct the loss investigation.

12. In their investigation of the loss, Chubb's adjuster and retained experts ("Exponent") found that CRS had, on the day of the loss (May 8, 2015), loaded heavy packing supplies in the second story storage mezzanine, directly above the portion of the Building that caved in later that same day. The packing material was CRS's personal property. The Chubb representatives determined the storage overload was sustained for approximately one hour before the Building caved in.

13. By June 1, 2015 at the latest, Chubb's adjuster had determined that the efficient proximate cause of the loss was the over-load caused by the weight of the packing material stored directly above the portion of the Building that caved in.

14. By not later than June 1, 2015, Chubb set initial loss reserves of $500,000 for temporary repairs, $500,000 for pier repair, $300,000 for business interruption, and $3,000,000 to replace the Building. Chubb was immediately advised that the construction company CRS had hired, with Chubb's approval, to undertake the temporary repairs estimated the cost to repair and replace the Building would be closer to $5,000,000. Chubb was advised early on that the business interruption loss would exceed $1,000,000. Chubb substantially under-reserved for this loss.

15. On June 26, 2015, Chubb's retained failure analysis experts, Exponent, issued its investigation report. Exponent confirmed that the large amount of packing material that was placed adjacent to the bearing wall that failed was the efficient proximate cause that set in motion the structural failure.

16. On July 28, 2015, Chubb issued a Reservation of Rights letter wherein it assured CRS that "Chubb endeavors to work cooperatively with you at all times and provide the highest quality of service to Copper River….[Chubb] would be undertaking a thorough and complete investigation of the claim." Chubb specifically advised that it was investigating the cause of the loss and the amount of the loss. Chubb went on in this letter to quote a long list of policy provisions and exclusions that Chubb indicated, without any analysis, might be implicated by the loss. Chubb

concluded the letter with the assurance that it would "endeavor to investigate the claim as quickly as possible."

17. On August 25, 2015, Chubb wrote to CRS stating 116 questions and demands for documents that Chubb contended had to be reviewed and analyzed before Chubb could make a coverage decision on the cause of the structural failure. CRS advised Chubb that 112 of the 116 questions and/or requests either were related to valuation issues that have no bearing on a coverage determination and could easily be addressed after the crush of the processing season, or were directly related to the Business Interruption and Extra Expense claims that had not even been submitted for consideration and were, therefore, not ripe for consideration. In fact, many of the questions and requests were simply make-work for CRS and its hired contractors. Nevertheless, CRS agreed to respond immediately to the four questions and requests that appeared to have relevance to a coverage determination, and committed to addressing the remainder as soon as practicable -- after the crush of the processing and production season.

18. CRS wrote to Chubb that it was "looking to its Insurer for much needed help with this untimely loss." Chubb denied every request that it bear the responsibility for the loss adjustment and investigation, and it denied every one of CRS's requests for assistance in the effort to gather information Chubb insisted had to be reviewed before a coverage decision could be made. Rather, Chubb repeatedly reiterated its insistence upon full answers to its questions and document production requests before it would issue any coverage decision.

COPPER RIVER SEAFOODS V. CHUBB INSURANCE  CASE NO. 3:16-CV-_____-___
COMPLAINT  PAGE 6 OF 19
F:\506636\65\00497463.DOCX
Case 3:16-cv-00039-TMB   Document 1   Filed 02/05/16   Page 6 of 19

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

19. Chubb was fully aware of the fact that this loss occurred one day before the beginning of CRS's critical processing and production season, and that all of CRS's resources (human and financial) were fully devoted to the all-important effort to process and produce fish. Chubb knew that it was impossible for CRS to divert its limited man-power resources away from its core business at that critical time just to respond to Chubb's multiple document requests, the vast majority of which were not on any critical loss-adjustment path. CRS had a duty to mitigate its losses and every lost production dollar was going to be a business loss item in the claim. If CRS's business failed as a result of CRS having to divert its resources to the structural failure loss adjustment effort, which Chubb was supposed to be handling, then the loss claim would be well above the $15 million primary limits and into the excess insurances.

20. Ignoring all of CRS's attempts to work with Chubb to focus attention on the questions and document requests that were germane to a determination of coverage, Chubb wrote to CRS on September 11, 2015 advising that it deemed all of the questions asked and documents requested relevant and necessary to review and analyze before Chubb could take any EUOs, and before a complete and final coverage determination could be made regarding the demolition and rebuilding of the damaged Building. Chubb wrote, "Chubb must fully research the scope, details, location, schedule, timing, and true costs and expenses associated with the loss before it can make a coverage determination." Chubb remained intractable on this issue up to the date it issued its declination of coverage – February 3, 2016.

21. On October 1, 2015, more than four months post-loss, Chubb issued a second Reservation of Rights letter to CRS. In this letter Chubb reserved its rights, without analysis, under the Business Errors and Rust Exclusions. Chubb stated that the reason for this late reservation of rights was because it did not have a copy of an engineering report that was issued by Schneider Engineering in June 2013 when Chubb wrote its original reservation of rights letter on July 28, 2015. Upon information and belief, Chubb obtained a copy of the Schneider Report in June 2015. In this second Reservation of Rights letter, Chubb wrote, "Please rest assured, Chubb is endeavoring to work cooperatively with Copper River at all times, and provide the highest quality of service to Copper River…"

22. Chubb decided early on in its loss investigation that CRS had committed fraud -- that it had intentionally concealed or misrepresented a material fact relating to the Policy. The background facts related to this issue are as follows:

    (a) In January 2012, one of Copper River's buildings at the Cordova facility collapsed under snow load. In the loss adjustment process of that claim, Chubb had Eric Burton, a Chubb regional manager, attend on-site to inspect the entire Cordova facility. Mr. Burton conducted that inspection on September 6, 2012.

    (b) On October 29, 2012, Mr. Burton issued a letter and Loss Control Recommendations to CRS stating, in pertinent part:

> Do [sic] to the age of the structure it is recommended that the piles and supporting structure be inspected by a licensed structural engineering company. Any defects that are noted in the inspection must be repaired to the satisfaction of the Authority Having Jurisdiction.

COPPER RIVER SEAFOODS V. CHUBB INSURANCE     CASE NO. 3:16-CV-_____-___
COMPLAINT     PAGE 8 OF 19
F:\506636\65\00497463.DOCX
Case 3:16-cv-00039-TMB    Document 1    Filed 02/05/16    Page 8 of 19

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

(c) CRS hired Schneider Structural Engineers ("Schneider") to perform the site inspection that Chubb recommended. Schneider attended on-site to conduct its inspection on March 28, 2013 and April 25, 2013. On or about May 13, 2013, Chubb was advised that Schneider was hired and had completed its inspection.

(d) On June 25, 2013, Schneider issued a report detailing its recommendations for repair and maintenance of the piling under the Cordova facility. Schneider filed its report with the City of Cordova -- it was a matter of public record. The recommended work was put out for bid by CRS and Enviro-Tech was hired to perform the repairs and maintenance as recommended by Schneider.

(e) Schneider was not hired to do the repair work because CRS determined its proposed repair methodology was experimental and too expensive for what was being offered. The technology Enviro-Tech proposed was well known and tested in the harsh Alaska environment. Enviro-Tech's estimated costs were considerable less than what Schneider proposed as well.

(f) Chubb was advised in May 2014 that Enviro-Tech had repaired/replaced 50 pilings that Schneider had deemed required immediate attention, that another 50 pilings were scheduled for repair/replacement in the spring of 2015, and that maintenance was ongoing as deemed necessary by Enviro-Tech and CRS.

(g) In December 2014, Chubb was advised that CRS was budgeting at least $1 million over the next three years for continuing to maintain and improve

COPPER RIVER SEAFOODS V. CHUBB INSURANCE  CASE NO. 3:16-CV-_____-___
COMPLAINT  PAGE 9 OF 19
F:\506636\65\00497463.DOCX

Case 3:16-cv-00039-TMB  Document 1  Filed 02/05/16  Page 9 of 19

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

the dock pilings. Another 50 pilings were replaced/repaired in the winter and early spring of 2015.

(h) Another 50 pilings were repaired/replaced in the winter and early spring of 2015.

(i) On May 8, 2015, the Building caved in. The pilings and beam that failed as a result of the overload of personal property on the bearing wall were not identified in the Schneider report as foundation support requiring attention.

(j) In June 2015, while investigating the loss, Chubb found the Schneider report in the City of Cordova public records. Chubb immediately suspected that Copper River had deliberately not produced a copy of this report to Chubb. Chubb had never asked CRS for a copy of the Schneider report.

23. In at least two public meetings, and in correspondence, Chubb has falsely accused CRS of "intentionally concealing" the Schneider report, or of "misrepresenting" the existence of that report. Chubb has carelessly publicly disparaged CRS's commercial reputation. Even after conducting an exhaustive search for some evidence to support its suspicion, and coming up empty, Chubb persisted in its effort to prove a fraud. As recently as January 26, 2016, Chubb was still pressing CRS to assist in its effort to locate some document that might make the case. In its February 3, 2016 declination of coverage letter, Chubb stated that one reason for the declination was its belief that Copper River had intentionally concealed the Schneider report from it. Chubb falsely states in this declination letter that it had made numerous requests to CRS for the production of the Schneider report.

24. Chubb's accusations are patently false. The correspondence between Chubb and CRS's insurance brokers show that Chubb has been informed of what CRS was doing over the course of three years to comply with Mr. Burton's Loss Control Service Recommendations. Chubb knew CRS hired Schneider to undertake a pier and piling condition survey and analysis; that CRS then decided not to work with Schneider, opting instead to work with Enviro-Tech; and that CRS entered into a contract with Enviro-Tech to perform a three-year, engineer-recommended repair and maintenance program. There is no evidence that Chubb ever, prior to the loss, asked CRS for a copy of the Schneider report. Even during the insurance due diligence periods around renewal of coverage, in November and December 2013 and 2014, Chubb did not ask CRS for a copy of the Schneider report. Chubb repeatedly renewed the insurance each year, gladly taking CRS's premium payments, and fully aware of the condition of the pier foundations. At no time has CRS or any of its owners, officers or employees intentionally concealed from Chubb, or misrepresented to Chubb, the existence of the Schneider report.

25. Chubb's preoccupation with its "fraud" investigation derailed any serious effort to determine whether the admitted efficient proximate cause of the loss is a covered cause of loss.

26. Upon information and belief, Chubb's focus in this loss adjustment, and all of the attendant effort of its employees and consultants, has been focused exclusively on proving that CRS intentionally concealed from Chubb the Schneider report or intentionally misrepresented the existence of that report; and in searching for any other basis upon which Chubb could support a denial of coverage.

27. Chubb has invested months in this effort to prove that CRS committed fraud, starting with gathering documents from several sources and obtaining statements under oath from at least five people. CRS has more than satisfied its cooperation obligations under the Policy in assisting Chubb's effort to prove that CRS committed fraud. CRS turned over every document it could find in its office records which might in any way pertain to the Schneider report. CRS authorized its insurance broker and Schneider Engineering to turn over their complete files pertaining to the Cordova facility and the Schneider report. CRS made four of its officers and employees available for lengthy EUOs: Mark Hansen, the COO for CRS sat for an EUO in Seattle on November 4, 2015; Scott Blake, the President of CRS, Dan Case, the CFO of CRS, and Vicki Olive, an employee of CRS, all sat for EUOs in Anchorage on November 23, 2015. Jake Bowman, a past employee of CRS, voluntarily sat for a recorded sworn statement in Seattle on October 14, 2015. Chubb has obtained records from other sources, including but perhaps not limited to, the City of Cordova through a public records disclosure request.

28. At each of the EUOs, Chubb advised CRS's witnesses that Chubb would provide them with a copy of their transcript to read and sign. Upon information and belief, Chubb did not follow through on its commitment and the transcripts were not provided to the witnesses for some time. Even after obtaining the transcripts, Chubb refused to make any decision on any issues related to coverage until it received the signature pages from the EUO witnesses. Chubb wrote: "While [CRS's] employees have cooperated in providing testimony, [CRS's] duty under the policy is not fulfilled until the transcripts have been signed and any corrections made by the

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

witnesses." The signature pages were all provided to Chubb, without any corrections, by January 12, 2012.

29. Chubb insisted that CRS preserve some steel sections from the pier demolition for inspection by its experts. CRS cooperated with this request and all of the identified steel sections that were removed from the facility during demolition were provided to Chubb's experts in the fall of 2015. There was one section of steel that was identified by Chubb for inspection that was not included in the demolition and repair work. It is referred to as "Bent 7." It is a steel member in a section of the facility that was not torn down in the demolition process and was not involved in any way in the loss. However, Chubb had identified this as a piece of steel it needed to inspect before a coverage decision could be made. Even though Chubb knew Bent 7 was not in the damage and repair zone, that it had not been removed in the demolition process, and that it had no bearing on the claim or coverage determination, Chubb wrote to CRS on December 10, 2015, demanding production of Bent 7 and advising that CRS's delay in producing Bent 7 had delayed the loss adjustment effort. Chubb has used the Bent 7 "red herring" in its attempt to blame CRS for Chubb's deliberate delay in the loss adjustment effort.

30. On December 10, 2015, Chubb wrote to CRS: "Chubb is nearing the conclusion of its coverage determination and claim investigation and desires to make a final decision promptly." But then on December 30, 2015, Chubb sent CRS an Authorization to Release and Disclose. By this release Chubb sought CRS's assistance in Chubb's effort to obtain a copy of all of the files and records from PND Engineers, Inc. and Reid Middleton, Inc., two companies who Chubb believes may

have documents related to the Schneider report. That release form purports to require an authorized representative of CRS to "fully acknowledge" and concede "understanding," by notarized signature, that "Chubb…is investigating the…loss in accordance with the provisions and terms of the [Policy]." CRS is not willing to make such an acknowledgment. Chubb has not conducted its investigation in accordance with the provisions of the Policy or the law. Chubb refused to conclude its investigation and make a coverage determination until CRS provided this signed and notarized release. But then on February 3, 2016, Chubb went ahead and declined coverage.

31. On several occasions, Chubb has misrepresented the Policy provisions or what the Policy required in violation of AS 21.36.125 (a)(1).

32. Chubb has repeatedly ignored or denied CRS's requests for documents and information pertaining to the loss adjustment and investigation, including CRS's repeated request that Chubb produce a copy of its engineering reports. Those reports (if they exist) have never been provided to CRS, yet in its declination of coverage letter Chubb refers to two engineering reports that purportedly support the conclusion that the efficient proximate cause of the loss is an excluded cause.

33. On October 28, 2015, CRS provided Chubb a Sworn Statement In Proof Of Loss setting forth a partial claim for losses sustained as a result of the May 8, 2015 structural failure. The Proof of Loss specifically noted that "the whole loss and damage is yet to be quantified" and stated a partial claim, fully supported by invoices, in the amount of $4,401,500. CRS told Chubb, and Chubb acknowledged, that the partial Proof of Loss was being submitted to comply with Chubb's insistence

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

that a Proof of Loss be submitted. CRS told Chubb that it was in desperate need of a partial payment in the amount stated in the Proof of Loss to reimburse it for completed work that CRS had paid for out of its own pocket. CRS repeatedly made it known to Chubb that the loss, Chubb's refusal to make a timely coverage decision, and Chubb's refusal to make any payment toward the claim, was taking a huge financial toll on CRS. The Proof of Loss and all of CRS's pleas fell on deaf ears.

34. On December 4, 2015, CRS wrote to Chubb asking what was holding up the coverage decision on the efficient proximate cause of the loss and, what had Chubb been doing to investigate and resolve the coverage issue during the several months since the loss occurred. Chubb did not respond until February 3, 2016 when it declined coverage.

35. Chubb has demonstrated an astonishing preoccupation with its own pecuniary interests throughout the loss adjustment process. By way of example only, Chubb advised CRS to attend to the covered loss as a prudent uninsured; to undertake every possible effort to mitigate the rapidly-increasing business interruption loss without any assistance from its insurer; observed from afar the demolition and repair process without providing any assistance; noted with indifference the outflow of millions of dollars from CRS for the demolition and repair work; insisted on burdensome document productions and EUOs during CRS's critical operational season, knowing full well that the vast majority of this "make-work" related to loss valuation, not coverage (proven by the fact that Chubb declined coverage without ever receiving and reviewing the documents); ignored CRS's many pleas for an expedited coverage decision because of the financial hardship this was

causing CRS; accused CRS and its people of fraud; and ultimately issued a declination of coverage based on a flawed analysis of the efficient proximate cause of the loss and a bogus contention that CRS intentionally concealed material information.

36. Reluctantly, CRS has had to resort to this lawsuit to obtain the benefit of its insurance contract and to recover the damages attendant to the manner in which Chubb has conducted itself in this matter.

## V. CAUSES OF ACTION
## FIRST CAUSE OF ACTION – DECLARATORY JUDGMENT

37. CRS restates and incorporates by reference the allegations set forth above to the same extent as if fully set forth.

38. Chubb is contractually obligated pursuant to the terms of the Policy to insure CRS against loss for structural failure, extra expenses, business interruption, ensuing loss, and all other pertinent coverages.

39. Chubb has denied coverage for the insured loss suffered by its insured.

40. Chubb's declination is a breach of the insurance contract and is a violation of the implied-in-law covenant of good faith and fair dealing.

41. Said breach and bad faith conduct has caused damage to CRS, the exact amount to be proven at time of trial.

42. The court has jurisdiction to declare the rights and legal relations between the interested parties pursuant to AS 22.10.020(g), including the determination that the insurance contract provides coverage.

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

## SECOND CAUSE OF ACTION – BREACH OF CONTRACT

43. CRS restates and incorporates by reference the allegations set forth above to the same extent as if fully set forth herein.

44. Chubb is contractually obligated pursuant to the terms of the Policy to insure CRS against loss for structural failure, extra expenses, business interruption, ensuing loss and all other pertinent coverages.

45. Chubb has denied coverage for any of CRS's insured losses flowing from the May 8, 2015 structural failure at the Building.

46. Chubb's declination is a breach of the insurance contract.

47. Said breach has and will cause damage to Copper River, the exact amount to be proven at time of trial.

## THIRD CAUSE OF ACTION – BAD FAITH

48. CRS restates and incorporates by reference the allegations set forth above to the same extent as if fully set forth herein.

49. Chubb is contractually obligated pursuant to the terms of the Policy to insure CRS against loss for structural failure, extra expenses, business interruption, ensuing loss and all other pertinent coverages.

50. Because there is an implied-in-law covenant of good faith and fair dealing inherent in the insurance contract, Chubb must act in good faith toward its insureds.

51. Chubb has refused to honor its insurance contract with its insureds.

52. Chubb has conducted its loss investigation and adjustment effort in violation of at least AS 21.36.125 (a)(1), (2), (3), (5), (6), (7), (13) and (14), as well as 3 AAC 26.040, 26.050, 26.070, 26.080 and 26.090.

53. Chubb's refusal to honor its insurance contract with its insureds, declination of coverage, and decision to conduct its loss investigation and adjustment effort in violation of AS 21.36.125 and the Alaska Claims Handling Regulations, is bad faith conduct and a violation of the implied-in-law covenant of good faith.

54. This bad faith conduct has caused damage to CRS, the exact amount to be proven at time of trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

1. A declaratory judgment that the May 8, 2015 structural failure at CRS's Cordova, Alaska facility triggered coverage under the Policy; that there are no applicable exclusions in the Policy to the efficient proximate cause of the loss; that CRS did not violate its cooperation obligations under the Policy; and that there is coverage for all of the proven losses incurred by CRS as a result of the structural failure;

2. Judgment against Chubb for all of the losses incurred by CRS as a result of the structural failure;

3. For all damages CRS suffered as a result of Chubb's breach of the insurance contract and the bad faith manner in which Chubb conducted its loss investigation and adjustment;

4. For all damages CRS has suffered as a result of Chubb's commercial disparagement of CRS;

COPPER RIVER SEAFOODS V. CHUBB INSURANCE  CASE NO. 3:16-CV-_____-___
COMPLAINT  PAGE 18 OF 19
F:\506636\65\00497463.DOCX
Case 3:16-cv-00039-TMB   Document 1   Filed 02/05/16   Page 18 of 19

5. For pre-judgment interest on all of the money CRS has spent on repairing its facility, on the business interruption loss, and the extra expenses incurred as a result of the structural failure and all ensuing related events;

6. An award of costs and attorneys' fees pursuant to Rule 82;

7. Punitive damages; and

8. Such other relief as the court may deem just and equitable.

DATED this  5th  day of February, 2016.

BIRCH HORTON BITTNER & CHEROT

By:   /s/ David Karl Gross
David Karl Gross, ABA #9611065
Leila R. Kimbrell, ABA #0611110
Birch Horton Bittner & Cherot
1127 W. Seventh Avenue
Anchorage, AK  99501
Telephone:  907.276.1550
Facsimile:  907.276.3680
dgross@bhb.com
lkimbrell@bhb.com

JED POWELL & ASSOCIATES, PLLC

By:   /s/ John E.D. Powell
John E.D. Powell, WSBA #12941
Pro hac vice pending
7525 Pioneer Way, #101
Gig Harbor, WA  98335
Telephone:  253.561.8791
jed@jedpowell.com

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA  99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680